Juan Manuel Guerrero v. State
















IN THE
TENTH COURT OF APPEALS
 

No. 10-02-00212-CV

     BRIAN PARDO AND JOHN McLEMORE,
                                                                              Appellants
     v.

     TRUMAN SIMONS, NED BUTLER,
     VIC FEAZELL, AND HOMER CAMPBELL,
                                                                              Appellees
 

From the 74th District Court
McLennan County, Texas
Trial Court # 98-634-3
                                                                                                                
                                                                                                         
O P I N I O N
                                                                                                                

      Brian Pardo and John McLemore (“Appellants”) bring this interlocutory appeal from the
denial of their summary-judgment motions based in whole or in part on constitutional and
statutory free speech rights. Tex. Civ. Prac. & Rem. Code Ann. § 51.014(6) (Vernon
1986). Finding no evidence of at least one element of the cause of action of each plaintiff, we
will reverse and render judgment for Appellants on the summary-judgment claims which are
the basis of this appeal.
 
I. BACKGROUND
      A jury convicted David Spence for the 1982 capital murders of three Waco teenagers in a
highly-publicized crime known as the “Lake Waco Murders.” Juries convicted Spence and
three others for their roles in the murders. Two received life sentences, and two received
death sentences. The State executed Spence by lethal injection in 1997. The Court of
Criminal Appeals reversed the conviction of the other defendant who received a death
sentence. See Deeb v. State, 815 S.W.2d 692 (Tex. Crim. App. 1991).
      Appellees all participated to some degree in the investigation and prosecution of Spence. 
Vic Feazell was the McLennan County Criminal District Attorney at the time. Ned Butler was
an Assistant Criminal District Attorney involved in the case. Truman Simons was a police
officer and later sheriff’s deputy who investigated the case. Homer Campbell was the
odontologist who testified at the trial, linking Spence to the murders through bite-mark
evidence.
      The media reported and speculated on the “Lake Waco Murders” heavily. Carlton
Stowers wrote a book, Careless Whispers, about the investigation and convictions, discussing
the roles the appellees played in the case. Carlton Stowers, Careless Whispers (1986). Pardo
published an article written by McLemore about Spence (“the article”) in the March 1997 issue
of Capitol Watch. The Lake Waco Murders Revisited, Is Justice Really Being Served? Capitol
Watch (March 1997). The article was published prior to Spence’s execution for the murders. 
Specifically, the article addresses the investigation and trial tactics used by the State in
prosecuting Spence. Pardo also sent a letter to the trial judge, requesting a stay of Spence’s
execution.
      After obtaining the article and a copy of the letter, Feazell, Simons, and Butler, joined by
Campbell, filed this suit against Appellants, who each filed four motions for summary
judgment. When the trial court denied their motions, Appellants sought review.
      They contend in five issues that the trial court erred by denying their: (1) traditional
motion for summary-judgment alleging that the plaintiffs are public figures as a matter of law;
(2) no-evidence summary-judgment motion regarding the falsity of the statements at issue; (3)
traditional summary-judgment motion alleging that they did not make the statements with
actual malice; (4) traditional summary-judgment motion alleging that their statements are
privileged as a matter of law; and (5) no-evidence summary-judgment motion regarding the
plaintiff’s damages.
      We will state the standards by which we are guided, then address Campbell’s claim, and
end with a discussion of the remaining appellees’ claims.
II. STANDARD OF REVIEW
      We review the decision to grant or deny a summary-judgment motion de novo. See
Rucker v. Bank One Texas, N.A., 36 S.W.3d 649, 653 (Tex. App.—Waco 2000, pet. denied). 
The trial court denied Appellants’ traditional and no-evidence motions, and an appeal was
taken under section 51.014(6) of the Texas Civil Practice and Remedies Code. Tex. Civ.
Prac. & Rem. Code Ann. § 51.014(6).
Motions for Summary Judgment
      The standards for reviewing a traditional motion for summary judgment are well
established. Nixon v. Mr. Property Mgmt. Co., 690 S.W.2d 546, 548 (Tex. 1985). The
movant has the burden of showing that no genuine issue of material fact exists and that he is
entitled to the summary judgment as a matter of law. American Tobacco Co. v. Grinnell, 951
S.W.2d 420, 425 (Tex. 1997); Ash v. Hack Branch Distributing Co., Inc., 54 S.W.3d 401,
413 (Tex. App.—Waco 2001, pet. denied). The reviewing court must accept all evidence
favorable to the non-movant as true. Nixon, 690 S.W.2d at 549; Ash, 54 S.W.3d at 413. 
Every reasonable inference must be indulged in favor of the non-movant and all doubts
resolved in its favor. American Tobacco, 951 S.W.2d at 425; Ash, 54 S.W.3d at 413. If the
movant for summary judgment is a defendant, then the movant must negate at least one of the
elements of the non-movant's cause of action, or, alternatively, the movant must conclusively
establish each element of an affirmative defense. Clifton v. Hopkins, 107 S.W.3d 755, 757
(Tex. App.—Waco 2003, pet. denied). The non-movant need not respond to the motion for
summary judgment unless the movant meets its burden of proof. Rhone-Poulenc, Inc. v. Steel,
997 S.W.2d 217, 222–23 (Tex. 1999). But if the movant meets its burden of proof, the
non-movant must present summary-judgment evidence to raise a fact issue. Centeq Realty,
Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995).
      We apply the same standard in reviewing the grant or denial of a no-evidence summary-judgment motion as we would in reviewing a directed verdict. Ash, 54 S.W.3d at 413. We
review the summary-judgment evidence in the light most favorable to the non-movant,
disregarding all contrary evidence and inferences. Id. A no-evidence motion will be defeated
if more than a scintilla of probative evidence exists to raise a genuine issue of material fact on
the element challenged by the movant. Id. More than a scintilla of evidence exists if it would
allow reasonable and fair-minded people to differ in their conclusions. Forbes Inc. v. Granada
Biosciences, Inc., 124 S.W.3d 167, 172 (Tex. 2003) (business disparagement case).
 

Defamation Actions
      Although the Constitution does not mandate preferential treatment of defamation
defendants in appeals from summary-judgment orders, we must give careful attention to ensure
that we do not discourage First Amendment rights. Casso v. Brand, 776 S.W.2d 551, 557-58
(Tex. 1989). And, although the plaintiffs’ burden at trial would be proof by clear-and-convincing evidence, we do not apply the heightened standard in the review of a summary-
judgment proceeding. Huckabee v. Time Warner Entertainment Co. L.P., 19 S.W.3d 413,
421-23 (Tex. 2000). Neither the trial court nor this court should weigh the evidence at the
summary-judgment stage; our only duty is to determine if a material question of fact exists. 
See id.
III. PERTINENT DEFAMATION AUTHORITIES
      To recover for defamation, a public figure or public official, such as Feazell, Simons, and 
Butler, must prove that the defendants published a false and defamatory statement with actual
malice. Id. at 420. Actual malice in a defamation case is a term of art. Unlike common-law
malice, it does not include ill-will, spite, or evil motive. Id. (citing Casso, 776 S.W.2d at
558); see also Forbes, 124 S.W.3d at 170–71. Rather, to establish actual malice, a plaintiff
must prove that the defendant made the statement "with knowledge that it was false or with
reckless disregard of whether it was true or not." Id. at 420 (citing New York Times Co. v
Sullivan, 376 U.S. 254, 279–80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)). Reckless disregard
is also a term of art. Id. To establish reckless disregard, a public official or public figure
must prove that the publisher "entertained serious doubts as to the truth of his publication." 
Id.; see also Forbes, 124 S.W.3d at 170–71.
      A libel defendant can negate actual malice as a matter of law by presenting evidence that
he did not publish the statement with knowledge of its falsity or reckless disregard for its truth. 
Id. (citing WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 574 (Tex. 1998)). Once the
defendant has produced evidence negating actual malice as a matter of law, the burden shifts to
the plaintiff to present controverting proof raising a genuine issue of material fact. See id.;
Tex. R. Civ. P. 166a(c).
      Whether the plaintiff is a public figure or not, falsity is always an element of the cause of
action, and truth is an absolute defense to defamation. See Garrison v. Louisiana, 379 U.S.
64, 74, 85 S. Ct. 209, 215, 13 L. Ed. 2d 125 (1964) (public figure); Philadelphia Newspapers,
Inc. v. Hepps, 475 U.S. 767, 768-69, 106 S. Ct. 1558, 1559; 89 L. Ed. 2d 783 (1986) (private
figure); Bentley v. Bunton, 94 S.W.3d 561, 580 (Tex. 2002) (public figure); Turner v. KTRK
Television, Inc., 38 S.W.3d 103, 116 (Tex. 2000) (public figure); McIlvain v. Jacobs, 794
S.W.2d 14, 15-16 (Tex. 1990) (private figure).
      A media defendant is a member of the print or broadcast media. Gertz v. Robert Welch,
Inc., 418 U.S. 323, 347–48, 94 S. Ct. 2997, 3010-11, 41 L. Ed. 2d 789 (1974). Pardo and
McLemore are media defendants. Pardo is the publisher of a print media source, the Capitol
Watch, and had a press identification card at the time of publication of the article. McLemore,
an employee of Pardo’s, is the reporter who wrote the article for Capitol Watch.
IV. DR. CAMPBELL
Appellants contend that the trial court erred by denying their no-evidence summary-
judgment motions premised on a lack of evidence that the statements were false. We agree.
At trial Campbell would bear the burden of proving falsity to prevail on his defamation
claim. See McIlvain, 794 S.W.2d at 15-16. Thus, in this proceeding if there is no more than a
scintilla of probative evidence to raise a fact issue on the element challenged, i.e., falsity,
Appellants are entitled to a summary judgment.
A. Substantial Truth Authorities
Courts use the “substantial truth” test to determine whether a statement is false. Masson
v. New Yorker Mag., Inc., 501 U.S. 496, 516-17, 111 S. Ct. 2419, 2433, 115 L. Ed. 2d 447
(1991); McIlvain, 794 S.W.2d at 15-16. If a statement has the same effect on the mind of the
average reader as a true statement, then it is not false. Masson, 501 U.S. at 517, 111 S. Ct. at
2433; McIlvain, 794 S.W.2d at 16. If the article correctly conveys the story’s gist but relayed
certain details incorrectly, the article will be considered substantially true. See Turner, 38
S.W.3d at 115.
B. Analysis
The evidence in the summary-judgment record relating to Campbell includes two court
decisions reviewing Spence’s conviction,


 Campbell’s deposition and trial testimony, Pardo’s
deposition, McLemore’s deposition, Butler’s deposition, the depositions of Raoul Schonemann



and Lt. Marvin Horton,


 a copy of the Krauss odontology report,


 the autopsy reports of the
three victims, and Feazell’s affidavit. The statements made in the article may be placed in
three primary categories: (1) Campbell’s findings and trial testimony; (2) differing opinions
from a panel of five expert odontologists who viewed the evidence and formed opinions
independently (Krauss Report); and (3) autopsy results which made no reference to bite marks. 
1. Statements Regarding Dr. Campbell’s Findings and Trial Testimony
The statements regarding Campbell’s findings and trial testimony in the article are:
The real damage to Spence and his attorneys was done by Dr. Homer Campbell who
presented the expert dental testimony and swore there were teeth marks on the breast
of one of the victims—Jill Montgomery. He further testified that the teeth marks
matched a dental mold he had made of Spence’s teeth.

All of the summary-judgment evidence supports the article’s statement that Dr. Campbell
testified that Spence’s teeth marks were on the breast of the victim. Feazell’s affidavit merely
states that another doctor agrees with Campbell’s findings.
2. Statements Regarding the Krauss Report
The Krauss Report shows that all five experts were concerned about the quality of the
evidence—three determined that no assessment could be made and two determined that they
could not rule out candidate number five, who was a housewife in another state. The article
quoted and paraphrased the doctors’ statements and the conclusions from the Krauss Report by
stating:
All five of the experts concluded that given the poor quality of the evidence
there was no way to determine with any degree of scientific certainty if the
marks were made by human teeth, and if they were, they concluded that it
would be impossible to determine with any degree of scientific certainty
which set of teeth made the marks.
 
We find the article’s characterization of the Krauss Report to be substantially true. See
McIlvain, 794 S.W.2d at 16. The Fifth Circuit’s opinion also refers to Spence’s attempt to
introduce the Krauss Report into evidence, but makes no comment as to the content or veracity
of the opinions. Spence v. Johnson, 80 F.3d 989, 1000 (5th Cir. 1996). Rather, the Fifth
Circuit concluded that, because the Krauss Report was filed late, it was properly excluded. Id. 
      Campbell also argues that Appellants’ claim that the panel of odontologists had the “exact
same” evidence to review is false. Pardo stated in his deposition that he did not personally
know whether the panel had the exact same evidence. Pardo stated that Schonemann told him
the evidence received by the panel was exactly the same as that used by Campbell and that he
relied on Schonemann’s representation and made no independent verification of that
representation. McLemore testified in the same manner in his deposition. Schonemann stated
in deposition that he does not know what information was provided to the panel because he was
not the attorney who provided the photographs and dental mold to the panel. Schonemann
further stated that he does not recollect what, if anything, he told Pardo and McLemore
regarding the evidence that was provided to the panel.
      The article conveys the nature of the report. The experts were provided with at least
sixteen photographs of the bodies and the molds of Spence and four others. Campbell’s
deposition testimony shows that he had only photos and Spence’s dental mold to reach his
conclusion. Whether each photograph was the “exact same” or nearly the same photograph of
the same three victims is not significant enough to have a different effect on the mind of the
reader. See id.
      We find no evidence to show that the panel did not have the same information that
Campbell had. Butler stated in his deposition that he “believed” that the panelists did not have
the same information as Campbell, but that he had no evidence to prove his belief.
 

3. Statements Regarding the Autopsy Report
      The article states (1) the autopsy report showed no bite marks, and (2) an officer who was
present during the autopsy confirms it. Consistent with the statement in the article, the autopsy
reports make no reference to bite marks.
      Campbell contests whether an officer was present during the autopsy. Simons’ affidavit
states that no officer was present at the autopsy. In support of their motion, Appellants refer to
Horton’s deposition. Horton states that, although the officers had not been present on the day
of the autopsy, they did discuss the autopsy with the doctor and view slides taken of the bodies
on the following day. He further states that he confirmed with the doctor that no bite marks
were present on the bodies. Based on Horton’s deposition testimony, we conclude that the
article correctly conveyed the gist of the story—that an officer confirmed the absence of bite
marks—despite the inaccuracy of certain details. See id.
4. Campbell’s Deposition
      Finally, Campbell stated in his deposition that to his knowledge the article contains no
“false or defamatory” statements. The deposition testimony states:
Q. (By Mr. De Diego) Mr. Campbell, during the break you had an opportunity to review
the Capitol Watch article that’s dated March, 1997; is that correct?
A. That’s correct.
Q. And did you, after reading that article, determine that there were any statements in
the article which were false and defamatory?
      A. Not to my knowledge.
Q. False and defamatory to you sir.
A. Not to my knowledge. 
Thus, the party with standing to complain about the falsity of statements testified that they are
not false.
5. Conclusion
      After reviewing all of the summary-judgment evidence in the record, we find no more than
a scintilla of evidence that Appellants’ statements about Campbell are false. See Masson, 501
U.S. at 517, 111 S. Ct. at 2433. Thus, we find that Appellants’ no-evidence motion
challenging the element of falsity as to Campbell’s claim should have been granted. 
Accordingly, Appellants’ issue is sustained. Because this issue is dispositive as to Campbell’s
defamation claim, we need not address the remainder of the issues with respect to him.
V. FEAZELL, SIMONS AND BUTLER
      Appellants contend that the trial court erred in denying their motions for summary
judgment because (1) Feazell, Simons, and Butler (referred to in this section as “Appellees”)
are public figures as a matter of law, and (2) Appellants have negated actual malice. We
agree.
A. Public Figure
      Feazell conceded that he is a public figure in his response to the summary-judgment
motions brought by the Appellants. Ned Butler was the Assistant District Attorney who
prosecuted Spence for the state of Texas. Butler is a public official because he was a
government employee who has or appears to have substantial responsibility or control over the
conduct of government affairs. Rosenblatt v. Baer, 383 U.S. 75, 85, 86 S. Ct. 669, 676, 15
L. Ed. 2d 595 (1966) (supervisor of a county recreation area). Simons was a police officer
and sheriff’s deputy during the time of Spence’s prosecution and therefore is a public official
as a matter of law. Hailey v. KTBS, Inc., 935 S.W.2d 857, 860 (Tex. App.—Texarkana 1996,
no writ) (deputy sheriff).
B. Actual Malice
      Following the Supreme Court’s method in Huckabee, we resolve this case solely on the
issue of whether Appellants negated the element of actual malice as a matter of law. 
Huckabee, 19 S.W.3d at 420. In doing so, we do not decide whether the statements about
Feazell, Simons, or Butler were true or false. Id.
      In 1964, the Supreme Court of the United States, through its decision in New York Times
Co. v. Sullivan, for the first time recognized constitutional protection for debate on public
matters even though some statements may be false or libelous. New York Times Co. v.
Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686. “In this case, the United States
Supreme Court elevated the common law privilege of fair comment respecting public officials
to constitutional status, thus expanding the privilege far beyond its previous common law
bounds.” Jerry A. Gibson, The Developing Law of Tort Liability for Non-Physical Harm: A
Guide for the Texas Practitioner, 18 St. Mary’s L.J. 899, 904 (1987). The First Amendment
protection of freedom of expression provides “the background of a profound national
commitment to the principle that debate on public issues should be uninhibited, robust, and
wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp
attacks on government and public officials.” New York Times, 376 U.S. at 270, 84 S. Ct. at
721.
      Even false statements must be protected, both because they are of value in public debate in
the examination of thought, and because a margin of error must be allowed to not discourage
participation and vigor in public discourse. Id., 376 U.S. at 270-78, 84 S. Ct. at 720-27. If
the critic is required to guarantee the truth of all of his assertions, “would-be critics of official
conduct may be deterred from voicing their criticism, even though it is believed to be true and
even though it is in fact true, because of doubt whether it can be proved in court or fear of the
expense of having to do so.” Id., 376 U.S. at 279, 84 S. Ct. at 725. The foundations of
republican government instill the people with censorial power over the government, and not
the government with censorial power over the people. Id., 376 U.S. at 274-75, 84 S. Ct. at
723-24 (quoting Madison in debate in house of representatives, 4 Annals of Congress, p. 934
(1794)).
      The Supreme Court weighed all of these policy concerns and formulated a new standard
for actual malice. For a public figure to recover from a media defendant, he must prove actual
malice, a falsehood made with subjective knowledge of its falsity or with reckless disregard of
its falsity. Id. The Supreme Court made this definition the constitutional minimum protection
and the applicable minimum protection for all State laws. Id., 376 U.S. at 283, 84 S. Ct. at
727; Huckabee, 19 S.W.3d at 420. A media defendant’s poor choice of words or content,
without more, does not amount to actual malice. Forbes, 124 S.W.3d at 174.
C. Application
      Appellants supported their motions for summary judgment on this issue with their own
affidavits. Pardo and McLemore each state his subjective belief in the truth of the statements
in the article. Pardo states that he had conversations with Spence on death row and, through
an investigation that included interviewing witnesses and reviewing records and transcripts,
became convinced that Spence was innocent and did not have a fair trial. He also states that he
has no personal animosity towards any of the Appellees and was not motivated out of ill-will,
spite, or anger. His affidavit speaks to both the article and the letter written to the trial judge. 
McLemore, the author of the article, describes the steps he took in researching various
materials for the article, including conducting “scores” of interviews, reading trial transcripts,
talking with Spence, reviewing autopsy reports and odontology reports, and reading other
material about the murders. He says that the statements in the article are based on the
information that he obtained from these sources and that he had no malicious intent toward any
of the Appellees.
      These affidavits from interested witnesses will negate actual malice only if they are “clear,
positive, and direct, otherwise credible and free from contradictions and inconsistencies.” 
Huckabee, 19 S.W.3d at 424. The affidavits must establish Appellants’ beliefs in the
challenged statements’ truth and provide a plausible basis for this belief. See id. We find that
the affidavits satisfy Rule 166a(c).
      We now examine whether Appellees offered summary-judgment evidence that
demonstrates a fact issue concerning malice on the part of Appellants. Id. at 420. This
evidence tends to fall into one of four categories: (1) failure to fully investigate, (2) fabrication
within the article, (3) purposeful avoidance of the truth in Catherine Breiten’s testimony, and
(4) controverting evidence relating to Detective Price.
1. Failure to Fully Investigate
Appellees allege that the article is false in general because Pardo and McLemore failed to
fully investigate. They allege that Pardo and McLemore generally did not check obvious
sources, for example, the trial transcripts. The summary-judgment evidence shows that while
McLemore read the transcripts, Pardo did not.
With reference to the presence or absence of bite marks on the victims’ bodies, Appellees
allege that Appellants did not investigate thoroughly enough. McLemore had checked the
autopsy reports which show there were no bite marks on the victims’ bodies. McLemore also
reported that Campbell, the odontologist, found that bite marks were on the bodies. Just
because McLemore did not address testimony taken later at trial from Dr. Gilliland, which
adds new information not included in her autopsy reports, does not mean that inferences or
conclusions cannot be drawn from the autopsy reports. Furthermore, we have found that the
statements in the article relating to bite-mark evidence are substantially true.
Next, Appellees claim that statements relating to Jesse Ivy and Kevin Mikel are not true,
and that this would have been discovered if Pardo and McLemore had contacted Feazell. Ivy
and Mikel are both quoted in the article saying that Butler and Simons gave them information
so they could falsely testify against Spence in exchange for conjugal visits with their wives in
Feazell’s office, on his black leather couch and in the library. This information is contained in
affidavits signed in 1991 by Ivy and Mikel. Neither Pardo nor McLemore contacted Feazell
about these allegations.
      In deposition, Butler denied trading conjugal visits for false testimony. Simons presented
no evidence regarding whether he participated in those events. Feazell alleges that Pardo and
McLemore failed to fully investigate by not contacting him. In summary-judgment evidence,
Feazell says that the couch in his office was not black but light brown, and that he never let an
inmate have a conjugal visit in his office. Additionally, Feazell states the library had a glass
window in the door, and a shade that could be drawn. Feazell says the library was constantly
in use and he never allowed anyone to have conjugal visits in the library.
Appellees further allege that Pardo and McLemore “engaged in selective information
gathering” by interviewing biased sources for statements regarding the State’s alleged
impropriety in obtaining jail-house testimony and withholding exculpatory evidence. Pardo
and McLemore relied on information from Spence, Spence’s attorneys, and police officers
among others. Pardo and McLemore did not contact any of the Appellees, or a list of
witnesses that favor Appellees’ side of the story, many of whom had testified at trial.
We find these assertions akin to the “purposeful avoidance” discussion in Huckabee. Id.
at 427-28. As the Court found in Huckabee, the extensive research described in McLemore’s
affidavit precludes a finding of purposeful avoidance. We find that Appellees have failed to
present evidence to establish a fact issue about purposeful avoidance of the truth. Id.
2. Allegations of Fabrication in the Article
      Appellees claim that there are fabrications within the article. They allege that the
statements written in the article regarding Melendez’s receipt of royalties from the sale of
Careless Whispers, the book about the Lake Waco murders, in exchange for his testimony, are
fabrications. After a careful review of the article, we find no such statement in the article. 
      Appellees also claim that the following statement is a fabrication: “Tab Harper was never
officially dismissed as a suspect.” Appellees present no evidence supporting their allegation
that the statement is false. A mere allegation is no evidence and insufficient to controvert
Appellants’ summary-judgment evidence. Next, Appellees claim that the following statement
is a fabrication: “James Russell Bishop failed a lie detector test when questioned about the
murders.” They present no summary-judgment evidence to substantiate their claim of
fabrication.
      We find no evidence to support any of these claims of intentional fabrication of false
statements. This assertion of intentional fabrication is akin to the “desire to portray Judge
Huckabee in an unflattering light” section of Huckabee. Id. at 424-25. Nothing in Appellees’
summary judgment evidence suggests that either Appellant had personal ill-will towards them. 
See id. And, under Huckabee, pressure to produce stories from a particular point of view,
even when they are hard-hitting or sensationalistic, is no evidence of actual malice. Id. at 425.
3. Catherine Breiten’s Testimony
      Appellees also allege that Appellants purposefully avoided the truth relating to the
testimony of Catherine Breiten because they published her testimony which was later recanted
without mentioning that she recanted. The article states:
Defense attorneys did know of one suspect, Ronnie Lee Breiten, and tried desperately to
present evidence about him at the trial. His stepmother was called to testify by defense
attorneys, but when Judge Allen ruled that he would allow the prosecution to ask questions
about the woman’s sex life, Catherine Breiten decided not to testify. She would testify
outside the presence of the jury that Ronnie Breiten’s wife came to her house the morning
after the murders. She said Joyce Breiten wanted to wash her husband’s clothes, which
were covered in blood and dirt. According to police reports, Joyce Breiten was a grocery
store cashier that cashed paychecks for two of the victims - Jill Montgomery and Raylene
Rice - the day of the murders. The jurors never heard about Ronnie Lee Breiten who
himself was murdered some years later.

In a deposition McLemore states that he read Breiten’s trial testimony and in camera
testimony.
      In testimony given out of the jury’s presence at the criminal trial, attorneys began to ask
Breiten questions about her sex life. Breiten stated that she was uncomfortable with the
questions, refused to answer them, and asked the Judge if she could get an attorney. The judge
allowed her time to get an attorney and had an in camera hearing the following day.
      Breiten stated, in camera, that she made everything up and gave an excuse for doing so. 
McLemore stated he was aware of this. He wrote in the article that she refused to testify
further right after she was asked about her sex life. The mere fact that Breiten later recanted
does not change the value of her prior testimony as grounds for debate. McLemore was free to
speculate about the reason why she did not further testify. This is an example of a statement,
worthy of further debate, which cannot be proven. To preclude the statement on the grounds
that it cannot be proven would sacrifice the full exploration of topics that are of public
concern.
      The circumstances of Breiten’s refusal to testify further, that she became noticeably upset
when the prosecution began to ask questions about her sex life and she refused to answer those
questions and later recanted, may form a subjective basis for McLemore’s statement, i.e., that
she did not want to testify for fear of exposure of her sex life. The fact that she recanted at the
in camera hearing does not make a reference to her prior testimony off-limits. Again, we find
that Appellees have not presented a purposeful avoidance case. See id. at 428.
4. Controverting Evidence Relating to Detective Price
      Juanita White, Spence’s mother, had also been murdered. Appellees filed summary-
judgment evidence suggesting that statements in relation to detective Jan Price were a
fabrication: “Detective Price was assigned to the (Juanita White) case, developed an early
suspect and then made an arrest. But her suspect would later be released without her
knowledge.” This allegation is supported by testimony of Detective Price in the prosecution of
Joe Sidney Williams in which she listed several suspects. Appellees also state that Benny
Carroll, whom they assume to be the suspect that is referred to by the article, was not among
that list. They provide, however, no evidence that Benny Carroll was the suspect that
Appellants were referring to.
      Appellees also bring forward evidence that statements in relation to Deeb were a
fabrication: “Even though . . . Deeb’s insurance agent, Alex Sanchez, would testify that Deeb
knew the insurance policy would not pay off in the event of murder or suicide, the prosecution
continued on with its theory.” They present a transcript of trial testimony by Alex Sanchez,
who stated that he explained to Deeb that the insurance policy would not pay off in the event of
murder or suicide and that Deeb understood.
      This assertion is akin to the discussion of “editorial choices” in Huckabee, where Judge
Huckabee complained of the defendant’s choice of material for its documentary. See id. at
425-26. The question is: did Appellants select their material with actual malice, i.e., with
awareness that the omitted material could create a substantially false impression? Id. at 426. 
We find no more than a scintilla of evidence that Appellants selected the material to present a
substantially false impression of Appellees. This is not a case of an omission that is so glaring
as to result in a gross distortion. See id. In the light most favorable to Appellees, Appellants’
failure to capture accurately all the story’s details may suggest an error in judgment, but that is
no evidence of actual malice. Id.
      We find no summary-judgment evidence which raises a fact issue concerning actual malice
on the part of Appellants. Id. at 420. Thus, because Appellants have negated actual malice as
a matter of law and Appellees’ proffered evidence does not raise a fact issue on this element,
we sustain Appellants’ issue.
 

VI. CONCLUSION
      We reverse the summary-judgment orders and render judgment that Campbell, Feazell,
Simons, and Butler take nothing by virtue of their claims arising out of the publication of the
Capitol Watch article. Each party will be liable for and taxed its own costs of this appeal. 
Tex. Civ. Prac. & Rem. Code Ann. § 51.015 (Vernon 1997).

 
BILL VANCE
Justice

Before Chief Justice Davis,
      Justice Vance, and
      Justice Gray
      (Chief Justice Davis not participating)



Reversed and rendered
Opinion delivered and filed July 28, 2004



[CV06]